IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA


DANIEL J. ELDER,                              )
                                             )
                    Plaintiff,               )        Civil Action No. 09-977
          v.                                 )
                                             )
                                             )
MICHAEL J. ASTRUE, COMMISSIONER              )
OF SOCIAL SECURITY                           )
                                             )
                    Defendant.               )

## MEMORANDUM OPINION

CONTI, District Judge


### *Introduction*

        This is an appeal from the final decision of the Commissioner of Social Security

("Commissioner" or "defendant") denying the claim of Daniel Elder ("plaintiff") for social

security disability insurance benefits ("DIB"), under Title II of the Social Security Act ("SSA"),

42 U.S.C. §§ 401-33; 20 C.F.R. pt. 404 and supplemental security income ("SSI"), under Title

XVI of the SSA, 42 U.S.C. §§ 1382-83; 20 C.F.R. pt. 416.  Plaintiff contends that the decision of

the administrative law judge (the "ALJ") that he is not disabled, and therefore not entitled to

benefits, should be reversed because the decision is not supported by substantial evidence.

Defendant asserts that the decision of the ALJ is supported by substantial evidence.  The parties

filed cross-motions for summary judgment pursuant to Rule 56(c) of the Federal Rules of Civil

Procedure.  The court will deny the cross-motions and remand this case for further proceedings.

## *Procedural History*

Plaintiff previously filed two applications for DIB and SSI – on August 31, 2002, and July 25, 2006 – which were denied. (R. 313-23, 339-42.) Plaintiff filed the applications at issue in this appeal on January 23, 2007, asserting a disability since February 28, 2001.[1] (R. at 9, 379, 388.) On June 5, 2007, plaintiff's claims were initially denied. (R. at 9, 343-51.) A timely written request for a hearing before an administrative law judge was filed by plaintiff, and the hearing was held on November 7, 2008. (R. at 20-61.) Plaintiff, who was then forty-two years of age, appeared with counsel and testified at the hearing. (*Id.*) In a decision dated February 18, 2009, the ALJ determined that plaintiff was not under a disability within the meaning of the SSA. (R. at 19.) The ALJ determined plaintiff had severe and non-severe impairments; however, plaintiff had the residual functional capacity to perform the full range of sedentary work at all times since the alleged onset date. (R. at 14-17.) Plaintiff filed a timely request to review the ALJ's decision, which was denied by the Appeals Council on May 27, 2009. (R. at 1-3.) Plaintiff timely filed this present action seeking judicial review.

## *Plaintiff's Testimony and Medical Evidence*

### *Testimony*

Plaintiff's hearing was held on November 7, 2008 (R. at 20.) At the hearing, plaintiff testified that he was first injured while working at Camden Metal, when the corner of a box hit him in his neck. (R. at 31.) After he was hurt, plaintiff received workers' compensation for a

---

[1]In his application for DIB plaintiff asserts he became unable to work on February 28, 2000. (R. at 381.) He asserted in his application for SSI that his disability began on June 18, 2004. (R. at 388.)

period of time and he attempted to go back to work. (R. at 31-32.) Plaintiff continued to work for three years despite his injury until he was told that he was going to be fired. (R. at 32.) Since that time, plaintiff has not worked any other job. (R. at 33.) Plaintiff stated that he suffers from anxiety, which has worsened with his increased difficulty with his mobility. (R. at 34.) Plaintiff has an ulcer and feelings of anger and worthlessness due to his condition. (R. at 35-37.) Plaintiff complained about difficulty sleeping because of his pain and inability to get comfortable in bed. (R. at 38.) Plaintiff stated that his pain was located on the right side of his neck and shoulder and goes down through his arm to his fingers. (R. at 39.) Plaintiff has constant pain in his knee. (*Id*.) He testified that he has difficulty going up and down steps, which limits his ability to stand and walk. (R. at 41.) Plaintiff will lay down during the day and he stated he cannot sit continuously for six hours at a time. (R. at 41, 43.) Plaintiff stated that his depression causes him to be a recluse and that he no longer spends time with friends and has very little energy to do any activities. (R. at 47-48.) Plaintiff testified that he did not feel that he could lift more than ten pounds and when he has to use his right arm, his fingers go numb and his shoulder cramps up. (R. at 52.) Plaintiff stated that he could not stand for a period of two hours or more without changing position. (R. at 52-53.)

A vocational expert (the "VE") testified that a person limited to standing or walking only four hours in an eight-hour workday would not be able to perform plaintiff's past relevant work of a shipping and receiving clerk, collating machine operator, and press operator. (R. at 57-58.) The VE explained that plaintiff's past relevant work was classified as medium and heavy physical exertion that would have required at least six hours of standing or walking. (*Id*.) Neither the ALJ nor plaintiff's attorney had any further questions for the VE. (R. at 58.)

### *Questionnaire on Daily Living*

In the questionnaire of plaintiff's activities of daily living, plaintiff stated that he lives with a friend or occasionally in an empty space of his father's warehouse. (R. at 181.) Plaintiff stated that increased physical activity would cause pain to radiate from behind his right ear down his arm to his fingers and it would make it very hard for him to sleep. (*Id*.) Plaintiff's condition has required him to get help with doing his laundry and cleaning up. (R. at 181-82.) Plaintiff is able to wash himself and take care of personal grooming; however, he stated that washing his hair and feet are difficult and cause him pain. (R. at 182.) Plaintiff is able to do his own grocery shopping if he carries one bag at a time. (*Id*.) Plaintiff takes short walks to try to maintain his health and he stated he can walk one-half mile to one mile without stopping. (R. at 183.) Plaintiff stated that he can sit for twenty to thirty minutes before needing to stretch his neck, shoulders and arms. (*Id*.)

Plaintiff stated that he is in constant pain that is located in his neck, shoulder, arm and hand and that he has to use a heating pad before he goes to bed and after he wakes up. (R. at 185.) He can only sleep up to four hours at a time before the pain wakes him up. (*Id*.) Plaintiff stated that his pain causes him problems in paying attention and being able to focus and make decisions. (R. at 186.) Plaintiff used a TENS unit in the past; however, it did not result in any lessening of his pain. (*Id*.) Plaintiff has had nerve blocks done, but they did not provide any results. (R. at 187.)

*Medical Evidence*

On June 3, 1997, plaintiff was seen by Dr. John Moossy for evaluation. (R. at 310.) Plaintiff complained of persistent neck and shoulder pain as a result of a workplace injury. (*Id*.) Dr. Moossy found plaintiff's nonfocal neurological examination to be of a good strength and that he had mildly hyperactive lower extremity reflexes. (*Id*.) Review of plaintiff's MRI revealed a C5-6 disc eccentric to the right side with impression on the spinal cord and C6 nerve. (*Id*.) Dr. Moossy noted that plaintiff lacked radicular symptoms and that his main complaint was of neck and interscapular pain that was common after neck surgery. (*Id*.) Plaintiff was advised that further surgery was likely not to be useful and nonsurgical therapy such as soft cervical traction, physiotherapy and non-narcotic pain medication were recommended. (*Id*.)

Plaintiff was seen by Dr. Howard Bursch on December 23, 1998. (R. at 308.) Dr. Bursch noted that plaintiff continued to have pain in his neck and right shoulder and that plaintiff reported that he was quite uncomfortable. (*Id*.) At the time, plaintiff was taking four Lorcets[2] a day and two to three Norflex.[3] (*Id*.) Plaintiff had diffused tenderness over the scapula and thoracic outlet; however, his reflexes were brisk and symmetrical. (*Id*.) Dr. Bursch took plaintiff off his job for six weeks and sent him to physical therapy. (*Id*.) On February 1, 1999, Dr. Bursch stated that although plaintiff was still complaining of bitter pain and spasms along the right scapula, a CT scan did not show a source of plaintiff's symptoms,. (R. at 307.)

---

[2]Lorcet is a schedule III narcotic which contains hydrocodone bitartrate and acetaminophen. *Physician's Desk Reference* 1180 (63rd ed. 2009).

[3]Norflex is the "trademark for a preparation of orphenadrine citrate." *Dorlan's Illustrated Medical Dictionary* 1309 (31st ed. 2007). Orphenadrine cititrate is "used as a skeletal muscle relaxant in acute spasm of voluntary muscles . . . ." *Id.* at 1358.

On February 2, 1999, plaintiff was seen by Dr. Bill Hennessey. (R. at 301-03.) Plaintiff complained of increased pain in his right shoulder, but denied any weakness in his upper right limb. (R. at 301.) Dr. Hennessey indicated that plaintiff had a greater slope from his neck to his right shoulder as compared with his left. (*Id*.) Flexion, abduction and extension testing indicated normal and symmetrical muscle bulk and there was no evidence of long thoracic nerve injury or spinal accessory nerve deficit. (R. at 302.) No other abnormalities were noted that would cause the significant pain over plaintiff's right trapezius muscle. (*Id*.) Dr. Hennessey concluded that plaintiff's symptoms were not related to his previous surgery and that his clinical history, physical examination, and electro-diagnostic findings did not support any specific medical diagnosis associated with the pain complaints. (R. at 302-03.)

Plaintiff was referred to Dr. Arthur Androkites on April 8, 1999. (R. at 298.) Dr. Androkites recounted plaintiff's workplace injury to his neck and stated that plaintiff's main complaints were spasms involving the right side of the neck radiating to the trapezius and scapular region. (*Id*.) Plaintiff stated he was walking three miles per day. (*Id*.) Dr. Androkites diagnosed plaintiff as having chronic neck and right parascapular pain which might be myofascial in origin and planned to try plaintiff on Neurontin[4] and recommended plaintiff consider aquatics rehabilitation and to continue his walking program. (R. at 299.) Dr. Androkites recommended that plaintiff lift no more than twenty pounds with no repetitive use of his right extremity and avoid lifting over his head with the right extremity. (*Id*.) Dr. Androkites indicated that plaintiff could work a full day with these restrictions. (R. at 297.) On April 19, 1999, Dr.

---

[4]Neurontin is the "trademark for preparation of gabapentin." *Dorland's Illustrated Medical Dictionary* 1287 (31st ed. 2007). Gabapentin is "an anticonvulsant . . . used in the treatment of partial seizures. . . ." *Id.* at 764.

Androkites stated that plaintiff was not tolerating Neurontin very well due to mental status changes, including lethargy, and that it was not improving his symptoms. (R. at 295.) Plaintiff was started on Flexeril[5] and Lorcet and plaintiff reported that he was able to perform most of his usual job duties at work. (*Id.*) Dr. Androkites gave plaintiff a series of stretching exercises to perform and told plaintiff that his goal was to reduce his Lorcet intake. (*Id.*) On April 27, 1999, although plaintiff took off work one day due to an exacerbation, plaintiff reported that he had been performing the stretching exercises. (R. at 294.) Dr. Androkites injected plaintiff with Lidocaine and plaintiff noted significant improvement. (*Id.*)

Plaintiff was again seen on May 21, 1999, where he reported that the injection had providing significant relief; however, progressive pain had increased and his right arm was tingling. (R. at 291.) Dr. Androkites gave plaintiff another injection of Lidocaine and plaintiff stated that he felt significant relief. (*Id.*) On June 14, 1999, plaintiff reported that his work was going reasonably well with the additional pain control and he requested another Lidocaine injection. (R. at 288.) Plaintiff told Dr. Androkites that he had lost his pain medication – Lorcet – over the weekend and Dr. Androkites was somewhat disturbed by that loss. (*Id.*) Dr. Androkites explained to plaintiff that the Lidocaine injections were not a chronic treatment and if plaintiff needed chronic opioids he believed that plaintiff ought to see a pain management specialist. (*Id.*) On June 24, 1999, Dr. Androkites asked plaintiff if he was addicted to Lorcet, which plaintiff denied. (R. at 287.) Dr. Androkites explained that the loss of a prescription is considered abuse in the medical literature and Dr. Bursch agreed that plaintiff may not be an

---

[5]Flexeril is the "trademark for a preparation of cyclobenzaprine hydrochloride." *Dorland's Illustrated Medical Dictionary* 725 (31st ed. 2007). Cyclobenzaprine hydrochloride is "used as a skeletal muscle relaxant for relief of painful muscle spasms. . . . " *Id.* at 463.

ideal candidate for chronic opioids. (*Id*.) As a result, Dr. Androkites referred plaintiff to a chronic pain specialist, Dr. Stephen Thomas. (*Id*.)

Plaintiff returned to Dr. Bursch on July 6, 1999. (R. at 262.) Plaintiff had chronic upper back pain and neck pain and was taking four to six Lorcet pills a day for the pain. (*Id*.) Plaintiff admitted to being dependent upon the Lorcet; however, he did not feel that it affected his work performance. (*Id*.) Dr. Bursch noted that plaintiff appeared angry and agitated that he was not getting better, having difficulty getting his prescriptions filled and paying for treatment. (*Id*.)

On September 15, 2000, Dr. Stephen Thomas had a follow-up visit with plaintiff and noted that plaintiff attempted to return to work at a medium to heavy physical level. (R. at 281.) Plaintiff had a marked increased in his pain symptoms and Dr. Thomas advised plaintiff to forego returning to his work because of the likelihood of further injury. (*Id*.) Dr. Thomas examined plaintiff on November 13, 2000 and noted that plaintiff continued to have severe right neck pain and pain related sleep disturbance. (R. at 280.) Dr. Thomas stated that plaintiff's pain medications were proving to be insufficient and he discussed with plaintiff the possibility of increasing his medication dosage. (*Id*.) It was noted that plaintiff's mood was dysthymic,[6] his cervical range of motion was limited and the best treatment option was a multidisciplinary chronic pain management and function restoration program. (*Id*.) On January 15, 2001, it was indicated that plaintiff was still in severe pain and the use of OxyContin[7] was becoming less

---

[6]Dysthymic means characterized by symptoms of mild depression, as in dysthymic disorder. *Dorland's Illustrated Medical Dictionary* 590 (31st ed. 2007).

[7]OxyContin is "indicated for the management of moderate to severe pain . . . ." *Physician's Desk Reference* 2590 (63rd ed. 2009). It "is an opioid agonsit and a schedule II controlled substance with an abuse liability similar to morphine." *Id.* at 2592 (emphasis omitted).

effective. (R. at 277.)  During that check-up, Dr. Thomas performed a right C6 selective nerve root block on plaintiff. (*Id*.)  Dr. Thomas reported on March 15, 2001, that plaintiff remained relatively stable since his last visit. (R. at 274.)  Plaintiff continued to have significant pain in his posterior shoulder girdle. (*Id*.) Plaintiff was assessed as having cervical postlaminectomy syndrome, cervical radiculopathy, and pain related sleep disturbance and was given a nerve block injection. (*Id*.)

On April 18, 2001, plaintiff was seen by Dr. Bursch with complaints of neck and shoulder pain. (R. at 510.)  Dr. Bursch reported that plaintiff's pain was a six-year problem and that he had a history of drug and alcohol abuse. (*Id*.)  Plaintiff asked Dr. Bursch for 20mg OxyContin because he felt the 40 mg dosage made him too drowsy. (*Id*.)

On April 25, 2001, Dr. Thomas noted that plaintiff was having increased interscapular pain from working at a desk job that required the continuous use of a mouse and sitting  for prolonged periods without breaks. (R. at 271.)  Plaintiff's pain from working at a computer did not improve from the nerve block that Dr. Thomas gave plaintiff on April 25, 2001. (R. at  268, 271.)  On August 13, 2001, Dr. Thomas noted that plaintiff was relatively stable and that he was working toward a change in career since his workers' compensation case had been settled. (R. at 267.)  Dr. Thomas's notes on March 14, 2002, indicate that plaintiff was having right leg pain, although plaintiff's gait was normal without antalgia[8]. (R. at 265.)  Dr. Thomas noted that plaintiff's mood was euthymic[9] and that his cervical range of motion still remained limited in

---

[8]Antalgia means counteracting or avoiding pain, as a posture or gait assumed so as to lessen pain. *Dorland's Illustrated Medical Dictionary* 98 (31st ed. 2007).

[9]Euthymic is a state of mental tranquility and well-being; neither depressed nor manic. *Dorland's Illustrated Medical Dictionary* 662 (31st ed. 2007).

rotation. (*Id.*)  On May 6, 2002, plaintiff's pain in his right extremity and neck were reported to

be unchanged and Dr. Thomas noted that plaintiff's mood continued to be euthymic and that he

was  occasionally working. (R. at 566.)  Plaintiff's pain persisted and he received further nerve

root block injections by Dr. Thomas on August 27, 2003 and November 13, 2003.  (R. at 564-

65.)

Plaintiff had a check-up with Dr. Bursch on May 6, 2003. (R. at 506.)  Dr. Bursch

reported that plaintiff was taking 120 mg Oxycontin per day that was providing some pain relief.

(*Id.*)  Dr. Bursch noted that plaintiff appeared very thin and gaunt and his weight was down to

133 pounds.   (*Id.*)  He diagnosed plaintiff as having C6 radiculopathy, chronic pain with narcotic

dependence and disability. (*Id.*)

On July 28, 2003, plaintiff had a psychiatric evaluation by Dr. Barbara Kennedy at the

Western Psychiatric Institute and Clinic ("WPIC").  (R. at 228.)  Plaintiff told Dr. Kennedy that

he had feelings of worthlessness and that he could not concentrate while taking OxyContin for

pain. (*Id.*)  Plaintiff complained about loss of interest and pleasure, decreased concentration,

energy and motivation and increased self pity, although he denied suicidal ideation. (*Id.*)

Plaintiff stated that his depression began in February 2000 when he lost his job. (*Id.*)  Plaintiff's

affect was assessed as being blunted and his mood was moderately depressed. (R. at 230.)

Plaintiff denied any hallucinations or suicidal or homicidal ideation. (*Id.*)  Dr. Kennedy

diagnosed plaintiff as having major depressive disorder, recurrent, moderate and assessed his

Global Assessment of Functioning ("GAF")  score at 50.[10]  (R. at 222.)

_____

[10]The GAF scale, designed by the American Psychiatric Association, ranges from zero to
one hundred and assesses a person's psychological, social and occupational function. *Diagnostic
and Statistical Manual of Mental Disorders* (DSM-IV-TR) 34 (4th ed. 2000).  A score between

Progress notes on August 19, 2003, by a licensed social worker, Nina Bridenbaugh ("Bridenbaugh"), at WPIC indicated that plaintiff was taking Lexapro[11] for depression, was in pain while sitting and had difficulty holding a telephone receiver to make a phone call. (R. at 227.) It was also mentioned that plaintiff was sleeping better. (*Id*.) On August 19, 2003, Dr. Kennedy met with plaintiff and reported that plaintiff's son was with him and went with him to a state park for a cookout. (R. at 220.) Dr. Kennedy noted that plaintiff was having no side effects from the Lexapro and that he was sleeping well and his appetite was good. (*Id*.) On September 23, 2003, Dr. Kennedy noted that plaintiff's mood was down and his sleep was disruptive and was not improving with medication. (R. at 224.) Bridenbaugh stated that plaintiff was very depressed and discouraged and noted that plaintiff's depression was severe. (R. at 226.)

On May 18, 2004, plaintiff reported that his pain was relatively stable and that his activity level improved with the use of his medications. (R. at 563.) On May 27, 2004, plaintiff had another nerve root block injection for his neck and shoulder pain. (R. at 562.) On August 12, 2004, plaintiff stated he was in more pain lately, although he felt his activity level had increased with the new medication. (R. at 561.) Dr. Thomas detected that plaintiff smelled of alcohol and plaintiff admitted having one beer at lunch. Dr. Thomas, however, stated that he suspected plaintiff had more to drink. (*Id*.) On August 19, 2004, plaintiff returned to Dr. Thomas for another nerve root block injection and he complained that the pain had become relatively severe

_____

41 and 50 indicates "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupation, or school functioning (e.g., no friends, unable to keep a job)." *Id*.

[11]Lexapro "is indicated for the treatment of major depressive disorder." *Physician's Desk Reference* 1175 (63rd ed. 2009).

in his right arm and neck. (R. at 560.) Between April 21, 2005 and February 28, 2008, plaintiff underwent nine nerve root block injections performed by Dr. Thomas. (R. at 548-59.)

On June 12, 2006, Dr. Thomas reported that plaintiff had new left neck symptoms and a CT scan of the cervical spine showed considerable osteophytic ridging at the site of plaintiff's cervical discectomy and fusion. (R. at 600.) On April 18, 2006, plaintiff had a CT scan of his cervical spine that showed spondylolisthesis[12] of the C2 on C3. (R. at 601.) There was also a posterior osteophyte at the lower margin of C5 that was protruding into the spinal canal. (*Id*.)

On March 22, 2006, plaintiff reported to Dr. Bursch that he did not feel depressed any more and that he weaned himself off Lexapro. (R. at 500.) Plaintiff continued to take 40mg Oxycontin twice a day and he was not sleeping well. (*Id*.) He stated that he was not drinking alcohol and that he attends AA. (*Id*.) Dr. Bursch noted that plaintiff's head and neck range of motion was restricted in all planes and that plaintiff had insomnia. (*Id*.) On June 22, 2006, plaintiff complained to Dr. Bursch about stomach problems, including throwing up in the morning, frequent abdominal pain, heartburn more than two times a week and feeling full before finishing a meal. (R. at 495.) Dr. Bursch diagnosed plaintiff as having GERD[13] and was given a prescription for Prevacid. (*Id*.) On July 20, 2006, Dr. Bursch reported that the Prilosec seemed to be working and noted that he refused to order Percocet for breakthrough pain. (R. at 494.) On August 10, 2006, plaintiff reported having a strained right knee with pain that was getting

---

[12]Spondylolisthesis is "forward displacement . . . of one vertebra over another, . . ., usually due to a developmental defect. . . ." *Dorland's Illustrated Medical Dictionary* 1779 (31st ed. 2007).

[13]GERD means "gastroesophageal reflux disease." *Dorland's Illustrate Medical Dictionary* 783 (31st ed. 2007).

worse. (R. at 493.) An MRI showed a torn ACL, medial meniscus and sprained medial ligaments. (*Id*.) Dr. Bursch noted that plaintiff appeared moderately distressed and prescribed hydrocodone-acetaminophen for the knee pain. (*Id*.) Plaintiff appeared for a pre-op visit for surgery on his right knee on September 12, 2006. (R. at 490.) Dr. Bursch stated that plaintiff was to have arthroscopic repair for the tear of his right medial meniscus, but the ACL was not going to be repaired because plaintiff was not interested in sports. (*Id*.)

Plaintiff was seen by Dr. Jon Sekiya on September 7, 2006, following a motorcycle accident which caused an injury to plaintiff's right ACL and right medial meniscus. (R. at 542.) Plaintiff reported that his knee injury intermittently blocked him from fully extending his knee. (*Id*.) Plaintiff complained about his neck pain and Dr. Sekiya reported that plaintiff was not very active. (*Id*.) Due to concerns about pain associated with surgery, plaintiff decided not to have his ACL repaired and only wanted the meniscus tear treated. (*Id*.)

Dr. Curt Conry saw plaintiff on October 16, 2006. (R. at 622.) Plaintiff stated that he continued to have intermittent right upper extremity pain which was essentially relieved with nerve root block injections. (*Id*.) Plaintiff recounted his knee surgery that resulted from plaintiff injuring his knee while riding a dirt bike in a field. (*Id*.) Plaintiff continued to have intermittent pain in his right shoulder region that radiated into his arm. (*Id*.) Dr. Conry's exam indicated that plaintiff was 5 out of 5 in his upper and lower extremities and right deltoid, and 4+ out of 5 in his right biceps and triceps and his reflexes were intact. (*Id*.) Plaintiff had a poor quality cervical and thoracic MRI scan and there was some mild foraminal narrowing at C5-6; however, Dr. Conry did not see any significant nerve root compression. (*Id*.) Plaintiff's EMGs were within normal limits and showed no nerve root irritation or radiculopathy. (*Id*.) As a result, Dr. Conry

believed no further testing or surgical intervention was warranted as plaintiff's pain was transient in nature, there was a "relative lack of findings in his physical exam" and plaintiff was able to ride motorcycles. (*Id*.) Dr. Conry noted that plaintiff did not appear to be in discomfort during his exam and the MRI was relatively benign. (*Id*.)

Plaintiff was seen by Dr. Sekiya on April 3, 2007, which was seven months after plaintiff's right knee arthroscopy. (R. at 540.) Dr. Sekiya reported that plaintiff had not done any physical therapy since the surgery and had no follow- up examination. (*Id*.) It was noted that plaintiff was unable to jog or run and prolonged standing greater than one hour would cause plaintiff's knee to swell. (*Id*.) Dr. Sekiya noted that plaintiff had 30% quad atrophy and a positive straight leg raise with lag. (*Id*.) As a result of not following up with physical therapy or post-surgery examination, Dr. Sekiya concluded that plaintiff's knee was not doing very well. (*Id*.)

Dr. Thomas assessed plaintiff as being temporarily disabled for the Pennsylvania Department of Public Welfare from July 1, 2003 through August 1, 2008, due to cervical radiculopathy. (R. at 263-64, 620-21, 630-38.) On September 25, 2007, Dr. Thomas filled out a form for the Westmoreland County Housing Authority noting that plaintiff was disabled. (R. at 617-18.) On October 3, 2007, Dr. Thomas filled out an disability eligibility form for plaintiff. (R. at 614-15.) In the form, Dr. Thomas marked that plaintiff had a disability that would preclude him from engaging in any substantial gainful activity for at least twelve months. (*Id*.)

On January 12, 2008, plaintiff had an initial clinical interview at Kreinbrook Psychological Services ("KPS"). (R. at 692.) Plaintiff was diagnosed as having an alcohol dependence disorder and an adjustment disorder with mixed disturbance of emotions and conduct, as well as having borderline personality disorder. (R. at 698.) Plaintiff's mental status

was assessed as dramatic, his affect was stable, his speech was depressed, his mood was contradictory, his thoughts were clear, his content was poor, his judgment was very poor, his insight was poor, his concentration was stable and his memory was poor. (*Id*.) Plaintiff denied any suicidal or homicidal ideation and his GAF score was assessed to be 40.[14] (*Id*.) The interview notes indicate that plaintiff was having an inability to focus, trouble sleeping for months and he was bored. (R. at 691.) It was noted that plaintiff had requested medication for his attention issues. The clinician, however, advised that plaintiff was unlikely to be prescribed more medications due to his risky and potentially lethal behavior with using alcohol. (*Id*.)

Progress notes from KPS dated March 11, 2008, state that plaintiff continued to have complaints of sleep problems due to chronic pain and racing thoughts and that the sleep medication he was currently on was providing excellent results. (R. at 688.) On April 22, 2008, it was noted that plaintiff's appearance was neat, clean and casual and his mood was bright. (R. at 686.) It was reported that plaintiff felt motivated to stop drinking and was to begin Interferon treatment for Hepatitis C. (*Id*.) On July 29, 2008, plaintiff reported that his "mood has been all over the place" and that he was in need of pain management. (R. at 685.) Plaintiff reported that he had been totally abstaining from drinking alcohol since February 5, 2008. (*Id*.) Plaintiff was given the Becks Depression Index test and Becks Hopelessness Index test on which he scored in the severe range. (*Id*.) On November 14, 2008, KPS progress notes reported that plaintiff described death wishes rather than suicidal ideation and stated that he would not care if he did

_____

[14]A GAF score between 31-40 indicates "[s]ome impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g. depressed man avoids friends, neglects family, and is unable to work; . . . )." *Diagnostic and Statistical Manual of Mental Disorders* (DSM-IV-TR) 34 (4th ed. 2000).

not wake up or if he was hit by a bus.  (R. at 683.)  The clinician recommended that plaintiff be seen once a week for psychotherapy and have his depression addressed in cognitive behavioral therapy.  (*Id*.)

On May 16, 2008, Dr. Thomas received a call from a pharmacist that plaintiff sought to have his Oxycodone prescription filled at a different pharmacy than his regular pharmacy and that the pharmacist had an "uneasy feeling" about the plaintiff.  (R. at 545.)  Dr. Thomas stated that plaintiff is only to receive Oxycodone tablets and not capsules and that he can only have his prescription filled at his regular pharmacy.  (*Id*.)  On June 17, 2008, plaintiff had a follow-up visit with Dr. Thomas.  (R. at 544.)  Dr. Thomas noted that plaintiff's knee and neck pain were unchanged, his mood was in its normal range, there were no signs of intoxication and his gait was normal without antalgia.  (*Id*.)  Dr. Thomas  noted that he decreased plaintiff's Oxycodone prescription due to his belief that higher doses of opioid analgesics are not in plaintiff's best interest.  (*Id*.)

### State Examiner Disability Evaluations

On February 5, 2003, Dr. Victor Jabbour performed a disability evaluation of plaintiff on behalf of the Pennsylvania Bureau of Disability Determination.  (R. at 245-53.)  Dr. Jabbour noted that plaintiff's chief complaints was neck and back pain being constant and moderate to severe, depression and weakness on the upper right extremity.  (R. at 245.)  Plaintiff was noted as being cooperative and able to interact with the examiner without difficulty, although plaintiff looked mildly depressed.  (R. at 248.)  Although plaintiff had weakness in the right upper extremity, his upper extremities were within normal limits.  (*Id*.)  He was able to squat and get on and off the exam table without difficulty and was able to get in and out of a chair without

difficulty.  (*Id*.)  Dr. Jabbour diagnosed plaintiff as having neck pain secondary to arthritis and disc disease, back pain secondary to post-traumatic injury and arthritis, depression and weakness in upper right extremity.  (R. at 249.)  Dr. Jabbour assessed plaintiff as being limited to lifting and carrying no more than ten pounds occasionally, standing and walking for one hour or less, sitting less than six hours, and limited in pushing and pulling with right extremity.  (R. at 250.) Plaintiff was assessed as only being able  occasionally to bend, kneel, stoop, crouch, balance, and climb, and was restricted to avoid heights, moving machinery, temperature extremes and humidity.  (R. at 251.)

On March 10, 2003,  Dr. Douglas Schiller assessed plaintiff's mental impairment limitations.  (R. at 231-44.)  Dr. Schiller marked that plaintiff had an affective disorder characterized by decreased energy and depression, but his impairments were not severe. ,(R. at 231, 234.)  Plaintiff was assessed as having only mild restrictions in activities of daily living, difficulty in maintaining social functioning, concentration, persistence and pace.  (R. at 241.)

On March 11, 2003, plaintiff was given a physical functional capacity assessment.  (R. at 173-80.)  Plaintiff was assessed as being able to lift and carry twenty pounds occasionally and to lift and carry frequently ten pounds.  (R. at 174.)  He was noted to have no limitations in pushing or pulling and could sit, stand or walk for up to six  hours in an eight-hour work day.  (*Id*.)  No other physical limitations were found.  (R. at 175-79.)

On May 8, 2007,  Dr. Edward Johnson assessed plaintiff's physical functional limitations. (R. at 517-25.)  Dr. Johnson recounted plaintiff's history of neck and shoulder pain that radiates into his arm as well as plaintiff's knee injury.  (R. at 517.)  Plaintiff stated that he had trouble with his dexterity, he dials the wrong number on the phone, and he has to take breaks when he

vacuums a room and he has trouble combing his hair and washing the dishes. (*Id.*) Plaintiff's exam showed an unremarkable head and neck, no focal, motor or sensory deficits, and no muscle atrophy in the arms and he generally appeared well and in no acute distress. (R. at 518.) Dr. Johnson noted that plaintiff had mild decreased range of motion of the knee and of the right shoulder, his gait was normal, a straight leg test was negative, and he could walk on his heels and toes, squat and get in and out of a chair without difficulty. (*Id.*) Dr. Johnson assessed plaintiff as being able frequently to lift and carry twenty pounds and occasionally lift and carry up to 100 pounds. (R. at 520.) Dr. Johnson found plaintiff able to stand and walk up to four hours and that he had no limitations in sitting. (*Id.*) Dr. Johnson noted that plaintiff would have no limitations in pushing or pulling, although he found plaintiff could never kneel, stoop or crouch and could only occasionally bend, balance and climb. (R. at 520-21.) Dr. Johnson found that plaintiff had no other physical limitations or any environmental limitations. (*Id.*)

On May 10, 2007, Dr. Diane Fox filled out a physical residual functional capacity assessment form for plaintiff. (R. at 526-31.) Dr. Fox listed plaintiff's diagnoses as narcotic dependence with a secondary diagnosis of post-laminectomy syndrome. (R. at 526.) Plaintiff was assessed as being able occasionally to lift and carry twenty pounds and frequently to lift and carry ten pounds. (R. at 527.) Plaintiff could stand and walk for about six hours and could sit for a total of six hours in an eight-hour work day. (*Id.*) Plaintiff was found to have no limitations in his ability to push or pull and had no other physical limitations. (R. at 527-30.) Dr. Fox stated that the medical evidence establishes that plaintiff has a medically determinable impairment of narcotic dependence and post-laminectomy syndrome. (R. at 531.) The medical evidence was said to reveal that plaintiff has pain complaints since the time of his C5-6 laminectomy; however,

there has never been any documented neurosensory deficit, weakness or atrophy in plaintiff's right arm. (*Id.*) Dr. Fox stated that the record did not indicate any serious limitation in plaintiff's daily activities and the evidence of limitations prior to the date last insured was inadequate to address the credibility of plaintiff's claims of limitations. (*Id.*)

On May 10, 2007, plaintiff's physical residual functional capacity was assessed by Melanie Lochner. (R. at 532-38.) Plaintiff's primary diagnosis was right knee ACL tear and meniscus tear and secondary diagnosis was post-laminectomy syndrome. (R. at 532.) Plaintiff was assessed as being able occasionally to lift and carry twenty pounds and frequently to lift and carry ten pounds. (R. at 533.) Plaintiff was noted to be able to stand and walk up to six hours and could sit for six hours of an eight-hour work day. (*Id.*) Plaintiff was found to have no limitations in the ability to push or pull and no other physical or postural limitations. (R. at 533-35.) It was noted that plaintiff would need to avoid even moderate exposure to fumes, odors, dust and poor ventilation. (R. at 535.) Plaintiff's allegations of pain were questioned based on his chronic narcotic dependence. He, however, was found to be partially credible by the examiner. (R. at 538.) The examiner stated that plaintiff's assessment partially reflected the opinions of Dr. Johnson about plaintiff's functional capacity. (*Id.*)

### *Legal Standard*

Judicial review of the Commissioner's denial of a claimant's benefits is proper pursuant to 42 U.S.C. § 405(g). This court must determine whether there is substantial evidence which supports the findings of the Commissioner. 42 U.S.C. § 405(g). Substantial evidence has been defined as "such relevant evidence as a reasonable mind might accept as adequate to support a

conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co v. NLRB*, 305 U.S. 197, 229 (1938)). This deferential standard has been referred to as "'less than a preponderance of evidence but more than a mere scintilla.'" *Burns v. Barnhart*, 312 F.3d 113, 118 (3d Cir. 2002) (quoting *Jesurum v. Sec'y of Dep't of Health & Human Servs.*, 48 F.3d 114, 117 (3d Cir. 1995)). This standard, however, does not permit the court to substitute its own conclusions for that of the factfinder. *Id.* (citing *Williams v. Sullivan*, 970 F.2d 1178, 1182 (3d Cir. 1992)).

### *Discussion*

Under Title XVI of the SSA, a disability is defined as the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c (a)(3)(A). A person is unable to engage in substantial gainful activity when "his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 1382c (a)(3)(B).

In order to make a disability determination under the SSA, a five-step sequential evaluation must be applied. 20 C.F.R. §§ 404.1520, 416.920. The evaluation consists of the following phases: (1) whether the claimant is currently engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment; (3) if so, whether the claimant's severe impairment meets or equals the criteria of an impairment listed in 20 C.F.R. pt. 404, subpt. P,

app. 1; (4) if not, whether the claimant's impairment prevents him from performing his past relevant work; and (5) if so, whether the claimant can perform any other work which exists in the national economy in light of his age, education, work experience, and residual functional capacity. 20 C.F.R. §§ 404.1520, 416.920; *see Sykes v. Apfel*, 228 F.3d 259, 262-63 (3d Cir. 2000). If the plaintiff fails to meet the burden of proving the requirements in the first four steps, the administrative law judge may find that the plaintiff is not disabled. *Burns*, 312 F.3d at 119. The Commissioner is charged with the burden of proof with respect to the fifth step in the evaluation process. *Id.*

In the instant case, the ALJ found plaintiff met the insured status requirements of the SSA through December 31, 2005, but not thereafter. With respect to the sequential evaluation, the ALJ found: (1) plaintiff had not engaged in substantial gainful activity since February 28, 2001; (2) plaintiff did not have a severe mental impairment and suffers from cervical disc disease, post laminectomy syndrome, and since the date last insured, right knee anterior cruciate ligament and meniscal tears, hepatitis and gastroesophageal reflux disease; (3) plaintiff does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. pt. 404, subpt. P, app. 1; (4) plaintiff cannot return to any past relevant work; and (5) since plaintiff has the residual functional capacity to perform the full range of sedentary work[15] activity as defined in 20 C.F.R. §§ 404.1567(a) and 416.967(a) and considering

---

[15] Sedentary work is defined as follows:
> (a) Sedentary work. Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

his age, education and work experience, there were jobs in the national economy that plaintiff could perform.  (R. at 11-19.)

Plaintiff raises two main issues:

1.    Whether the ALJ's finding that plaintiff did not have a severe mental impairment was supported by substantial evidence and adequately explained.
2.    Whether the ALJ rejected medical opinion evidence without an adequate explanation.

Each of these issues will be addressed.

**A.    *Whether the ALJ's finding that plaintiff did not have a severe mental impairment was supported by substantial evidence and adequately explained*.**[16]

At step two of the sequential analysis the ALJ found that plaintiff's "adjustment disorder with mixed disturbance of emotion and conduct and alcohol dependence do not cause more than minimal limitations in the [plaintiff's] ability to perform basic mental work activities and are therefore non-severe." (R. at 12.)  In making this determination, plaintiff argues that the ALJ failed to consider all the evidence related to plaintiff's mental impairments, the ALJ's analysis is not supported by substantial evidence in the record and this finding is inadequately explained.

> [The] cardinal principle guiding disability eligibility determinations is that the ALJ accord treating physicians' reports great weight, especially "when their opinions reflect expert judgment based on a continuing observation of the patient's condition over a prolonged period of time." *Plummer v. Apfel*, 186 F.3d 422, 429 (3d Cir. 1999) (quoting *Rocco v. Heckler*, 826 F.2d 1348, 1350 (3d Cir.1987)) . . . .

---

20 C.F.R. §§ 404.1567(a); 416.967(a).

[16]Plaintiff argued that since the ALJ did not mention or rely on the previous decisions, res judicata was not raised by the Commissioner.  (Pl.'s Br. 2.)

*Morales v. Apfel*, 225 F.3d 310, 317 (3d Cir. 2000) (additional citations omitted). An administrative law judge must weigh conflicting medical evidence and can chose whom to credit, but "'cannot reject evidence for no reason or for the wrong reason.'" *Id.* at 317 (quoting *Plummer*, 186 F.3d at 429). An administrative law judge must consider all medical findings supporting a treating physician's assessment that a claimant is disabled, and can only reject a treating physician's opinion on the basis of contradictory medical evidence – not on the ALJ's own credibility judgments, speculation or lay opinion. *Id.* at 317-18.

An administrative law judge must consider all medical evidence in the record and provide adequate explanations for disregarding or rejecting evidence, especially when evidence of the claimant's treating physician is rejected. *See Wier ex rel. Wier v. Heckler*, 734 F.2d 955, 961 (3d Cir. 1984); *Cotter v. Harris*, 642 F.2d 700, 705 (3d Cir. 1981). He or she must also give serious consideration to the claimant's subjective complaints, even when those assertions are not confirmed fully by objective medical evidence. *See Mason v. Shalala*, 994 F.2d 1058, 1067-68 (3d Cir. 1993); *Welch v. Heckler*, 808 F.2d 264, 270 (3d Cir. 1986).

Plaintiff argues that the ALJ failed to consider or include in his discussion of plaintiff's mental impairments the treatment notes from WPIC and KPS. (R. at 223-30, 682-98.) Plaintiff was treated at WPIC in 2003 for major depressive disorder. (R. at 222.) Although Dr. Kennedy initially diagnosed plaintiff as having moderate depression, in the last reported visit, plaintiff was diagnosed with having severe depression. (R. at 222, 226.) Plaintiff was given a GAF score of 50 by Dr. Kennedy in September 2003. (R. at 222.) At KPS plaintiff was diagnosed as having alcohol dependence, adjustment disorder, and borderline personality disorder. (R. at 698.) While undergoing treatment at KPS, plaintiff was assessed to have a GAF score of 40 and the

Becks Depression Index test and Becks Hopelessness Index test were in the severe range. (R. at 685.) The Court of Appeals for the Third Circuit has noted that a Beck Depression Inventory indicating major depression in the severe range is relevant to a conclusion that a claimant "has a serious impairment." *Morris v. Barnhart*, 78 F.App'x 820, 824 (3d Cir. 2003).

As pointed out by plaintiff and not disputed by the Commissioner, the ALJ did not discuss plaintiff's treatment history at WPIC and only discussed the KPS treatment notes with respect to the rejection of plaintiff's GAF score of 40. In rejecting the GAF score from KPS the ALJ stated

> that the above referenced GAF score was rendered by a non-physician and is therefore not entitled to controlling weight. Finally, it is noted that the claimant has not required inpatient hospital confinement for his condition notwithstanding the degree of limitation suggested by the above referenced GAF score.

(R. at 17.) The only other medical evidence the ALJ cited with respect to plaintiff's mental impairments was the June 2008 report of Dr. Thomas indicating that plaintiff was alert and oriented and in a normal mood. (R. at 12, 544.)

The Commissioner argues that the ALJ did not err in failing to discuss the evidence because it does not show that plaintiff had a severe mental impairment. It is problematic that the ALJ did not address the Beck Depression tests when determining that plaintiff did not have a serious mental impairment. *See Morris*, 78 F.App'x at 824. This court cannot determine what weight, if any, the ALJ would afford to that evidence because it was not discussed by the ALJ. The substantial evidence standard requires the court to review those findings upon which an administrative law judge based his or her decision. The court cannot rectify errors, omissions or gaps in the medical record by supplying additional findings from its own independent analysis of

portions of the record which were not mentioned or discussed by the administrative law judge. *Fargnoli v. Massarini*, 247 F.3d 34, 44 n.7 (3d Cir. 2001). Here, the ALJ did not discuss or mention the March 2003 mental impairment assessment by Dr. Schiller or the 2008 results of the Beck Depression tests. (R. at 231-44, 685.) It is noted that there was no mental impairment assessment after 2003.[17] Since there is medical evidence that related to plaintiff's mental impairments and was not discussed by the ALJ, the case must be remanded for further consideration. On remand the ALJ should consider developing the record by having a mental impairment assessment conducted.

**B.      *Whether the ALJ rejected medical opinion evidence without an adequate explanation.***

Plaintiff's second argument is similar to and overlaps with his first argument in that he alleges that the ALJ failed to address or acknowledge some of the medical opinion evidence. Plaintiff points out that the ALJ failed to address the postural limitations reported by Dr. Jabbour and Dr. Johnson. (R. at 245-53, 517-25.) Plaintiff challenges the ALJ's rejection of the opinions of Dr. Thomas and the GAF score from Margaret Gibson at KPS.

Plaintiff correctly points out that the ALJ did not discuss Dr. Jabbour's findings or Dr. Johnson's postural limitations assessment.   In discussing Dr. Johnson's findings the ALJ stated:

> Moreover, a consultative physical examination in May 2007 by Dr. Johnson revealed normal range of motion of the cervical spine and right shoulder with no focal motor or sensory deficits; and Dr. Johnson competed a Medical Source Statement placing limitations on the claimant consistent with at least sedentary work activity.

---

[17] Plaintiff was last insured on December 31, 2005, and would not be eligible for DIB if he became disabled after that date. *See* 42 U.S.C. § 423(a)(1)(A); *Kane v. Heckler*, 776 F.2d 1130, 1131 n.1 (3d Cir. 1985). Plaintiff, however, would be eligible for SSI afer that date.

> Indeed, Dr. Johnson reported that the claimant could lift and carry
> 20 pounds on a frequent basis and stand and walk for four hours
> total in an eight hour workday and sit without limitations.

(R. at 14.)  The ALJ, however, failed to mention or discuss that Dr. Johnson assessed plaintiff to

never be able to kneel, stoop or couch and only occasionally bend, balance and climb.  (R. at

521.)  With respect to Dr. Jabbour's findings, the ALJ did not mention his assessment of plaintiff

at all in the decision.  Of note in Dr. Jabbour's assessment was that he found plaintiff to have

limitations in postural maneuvers.  (R. at 251.)   Because this case must be remanded for

reevaluation for other reasons, the ALJ on remand should consider the impact of plaintiff's

postural limitations.

With respect to the ALJ's rejection of Dr. Thomas's opinion and plaintiff's GAF score

from Margaret Gibson, the ALJ should revisit his decision rejecting these opinions after the other

medical evidence discussed above is fully considered.

### *Conclusion*

After consideration of the cross-motions for summary judgment and the record as a

whole, the court finds that substantial evidence does not support the ALJ's conclusion with

respect to whether plaintiff has  a "disability" as defined in the SSA.  The cross-motions for

summary judgment are **DENIED** and this case is remanded to the Commissioner for further

consideration consistent with this opinion.

An appropriate order will be entered.

By the court,
/s/ JOY FLOWERS CONTI
Joy Flowers Conti
United States District Judge

Dated:          July 9,  2010